# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| TIMOTHY J. HARRIS, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 2019-0736-JTL |
| | ) | |
| MARY ELLEN HARRIS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: November 9, 2022
Date Decided: January 23, 2023

Joel Friedlander, Christopher M. Foulds, David Hahn, FRIEDLANDER & GORRIS, P.A., Wilmington, Delaware; *Counsel for Petitioner/Plaintiff Timothy J. Harris*.

S. Michael Sirkin, R. Garrett Rice, ROSS ARONSTAM & MORITZ LLP, Wilmington Delaware; Gregory Lomax, LAULETTA BIRNBAUM, Sewell, New Jersey; Jill Guldin, FISHER BROYLES, LLP, Princeton, New Jersey; *Counsel for Kristen C. Harris and Megan Harris Loewenberg*.

David A. Jenkins, Julie M. O'Dell, SMITH, KATZENSTEIN & JENKINS LLP; Wilmington, Delaware; *Counsel for Mary Ellen Harris*.

Steven L. Caponi, Matthew B. Goeller, Megan E. O'Connor, K&L GATES LLP, Wilmington, Delaware; *Counsel for Mary Ellen Harris, Paul Petigrow, and Michael Schwager*.

Kurt M. Heyman, Patricia L. Enerio, Gillian L. Andrews, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, Delaware; *Counsel for Royce Management, Inc., Judith Lolli, and Charles Grinnell*.

John L. Reed, Ronald N. Brown, III, Peter H. Kyle, Kelly L. Freund, DLA PIPER LLP (US), Wilmington, Delaware; Neal J. Levitsky, E. Chaney Hall, FOX ROTHSCHILD LLP, Wilmington, Delaware; Emily A. Kaller, GREENBAUM, ROWE, SMITH & DAVIS LLP, Woodbridge, New Jersey; *Counsel for Harris FRC Corporation*.

William M. Kelleher, Phillip A. Giordano, Madeline Silverman, GORDON, FOURNARIS & MAMMARELLA, P.A., Wilmington, Delaware; *Counsel for The Mary Ellen Harris 2011 Grantor Retained Annuity Trust*.

**LASTER, V.C.**

Five of the six defendants have asked the court to dismiss this action under the doctrine of *forum non conveniens*. There is no earlier-filed action elsewhere involving substantially the same parties, addressing substantially the same subject matter, and pending in a court capable of providing substantial justice, so the defendants have the burden of showing that they would face overwhelming hardship from litigating in Delaware. The defendants have not met that standard. The motion is denied.

## I. FACTUAL BACKGROUND

The facts are drawn from the plaintiffs' Verified Supplemental and Third Amended Complaint (the "Complaint") and the documents that it incorporates by reference. [1] At this procedural stage, the plaintiffs are entitled to have the court credit their allegations and draw all reasonable inferences in their favor.

### A. The Company

Before May 2016, Harris FRC Corporation (the "Company") was a New Jersey corporation. From May 2016 until May 2019, the Company was a Delaware corporation. Since May 2019, the Company has been a New Jersey corporation. It is and always has been a family-held entity. Currently, its only stockholders are Mary Ellen Harris, her five adult children (the "Siblings"), and various trusts created for their benefit.

---

[1] Citations in the form "Ex. __" refer to documents attached to the Affidavit of Christopher M. Foulds, which collects certain documents that are incorporated by reference in the Complaint. Dkt. 467.

The family patriarch, Dr. Robert M. Harris, Sr. founded the Company after securing the patent rights for an epilepsy drug.[2] He monetized the patent rights through a license agreement with a global biopharmaceutical company and formed the Company to hold the rights and receive the royalty payments. That revenue stream historically amounted to approximately $100 million per year. The Company's only significant function was to collect and distribute the payments. In 2020, the Company sold its patent rights for $342 million in cash.

The Company has issued 1,000 shares. Originally, Dr. Harris and Mary Ellen owned all of the shares jointly as tenants by the entirety. In 2002, they transferred 38 shares to each of the Siblings, resulting in each owning a 3.8% interest. In 2011, Dr. Harris and Mary Ellen each created a grantor retained annuity trust (a "GRAT") and funded it with 245 shares. The GRATs had terms of seven years and would expire on December 31, 2018. At that point, the shares would be distributed to the Siblings. Through the combination of the 190 shares they received directly and the 490 shares distributed from the GRATs, the Siblings would receive a total of 680 shares, representing a controlling 68% interest in the Company.

---

[2] My standard practice is to identify individuals by their last name without honorifics. When individuals share the same last name, my standard practice is to shift to first names. Using first names is confusing because Dr. Robert M. Harris has a son with the same name. This decision therefore refers to the father as Dr. Harris. That reference is sadly also confusing, because one of the plaintiffs is Dr. Timothy J. Harris. This decision refers to him as Tim Harris.

**B.      Dr. Harris's Illness**

In October 2013, Dr. Harris was diagnosed with an aggressive form of aphasia consistent with Alzheimer's disease. As Dr. Harris's health deteriorated, Judith Lolli insinuated herself into Mary Ellen's financial life.

Lolli brought Mary Ellen into contact with her own friends and advisors. Paul Petigrow is a New Jersey lawyer who served as Lolli's personal counsel. Charles Grinnell is a New Jersey lawyer and career prosecutor who investigated and prosecuted the gangland murder of Lolli's brother, then became her close friend. Michael Schwager is Lolli's personal accountant and another close friend. Like the Complaint, this decision refers to Lolli, Petigrow, Grinnell, and Schwager collectively as the "Advisors."

**C.      The Takeover**

With Dr. Harris's health declining, questions arose as to who would lead the Company. Mary Ellen had no experience or qualifications for the role. The eldest Sibling, Robert M. Harris, Jr., had worked at the Company since 2000, held the office of Vice President, and managed the relationship that generated the Company's royalty stream.

A power struggle ensued with Mary Ellen and the Advisors on the one side and Robert on the other. In April 2015, eighteen months after his Alzheimer's diagnosis, Dr. Harris purportedly acted by written consent to remove Robert from his position as an officer.[3] The written consent added Mary Ellen to the board of directors (the "Board"),

---

[3] The Complaint alleges that Robert also signed a letter of resignation. In any event, he was out.

3

where Dr. Harris had been the sole director. The plaintiffs assert that Dr. Harris did not have the capacity to execute the written consent and that Lolli pulled the strings so that Mary Ellen gained control over the Company.

Immediately after the first consent, Dr. Harris and Mary Ellen executed a second consent that caused the Company to enter into "an agreement with Lolli in substantially the form submitted hereto." Compl. ¶ 32. The consent did not attach an agreement. In June 2015, Lolli and Mary Ellen executed an employment agreement which provided for Lolli's compensation to be determined at an unspecified future date. The Company began providing Lolli with benefits and paying her $15,000 as an employee. The Company retained Grinnell as a consultant at a rate of $110 per hour. Petigrow began doing legal work for the Company. Schwager took over as the Company's accountant. The Advisors had gotten their noses inside the tent.

In late summer 2015, Lolli and Grinnell decided to form Royce Management, Inc. ("Royce") as a vehicle for providing management services to the Company. In October, the Company began paying Royce $208,000 a month or $2,496,000 per year. The Company and Royce subsequently entered into a management services agreement that paid Royce $208,334 per month, or $2,500,128 per year. The agreement renewed automatically every year and provided for an annual fee escalator of 3.5%. The Company and Royce have amended the management services agreement twice, each time making it more favorable to Royce. In addition to the monthly fee, Mary Ellen has approved large end-of-year bonuses for Royce. In total, Royce received over $20 million from the Company between October 2015 and December 2020.

4

Royce is a shell. It has no employees other than Lolli and Grinnell, and it has no other clients. It has no assets other than its contract with the Company. It operates out of the Company's offices. It exists solely to channel money to Lolli and Grinnell. It has no expenses other than their salaries, pension contributions, distributions, and two $1,000 per month luxury car leases.

## D.    Dr. Harris's GRAT

To maintain control over the Company, Mary Ellen and the Advisors had to deal with the GRATs. If the GRATs distributed their 490 shares as planned, then control over the Company would pass to the Siblings.

Around the same time that the Company began paying Royce, Lolli served as a witness when Dr. Harris purportedly amended his GRAT and executed a codicil to his will. Petigrow oversaw the drafting of the documents. The principal consequence of the amendments was to redirect the 245 shares in Dr. Harris's GRAT from the Siblings to Dr. Harris's marital trust. That trust benefits Mary Ellen, and she has a power of appointment over its corpus, enabling her to determine where the assets go when the GRAT terminates. The transaction reduced the number of Shares that the Siblings would receive from 680 to 435, below majority control. The amendments to Dr. Harris's GRAT and the codicil to his will are not at issue in this litigation, but they provide important context.

The Advisors wanted a cooperative trustee for Dr. Harris's GRAT and the marital trust, so they turned to Dan Selcow, a wealth manager at First Republic Bank. Lolli and Grinnell had an existing relationship with Selcow, and he was a friend of Petigrow and Schwager. Initially, they brought some of the Harris' personal accounts to Selcow to

5

manage. Eager for more business, Selcow arranged for First Republic Trust Company of Delaware LLC ("First Republic Delaware") to take over as trustee.

## E. The Idea For The Inbound Merger

It was readily apparent that Robert might bring litigation over his removal and the events at the Company. New Jersey recognizes a claim for minority stockholder oppression, and available remedies include orders dissolving the corporation or appointing a custodian or provisional directors. A stockholder oppression lawsuit thus threatened to deprive Mary Ellen and the Advisors of control.

Mary Ellen and the Advisors believed that Delaware law would be more protective of their activities, so they started working on a merger that would move the Company to Delaware (the "Inbound Merger"). As Mary Ellen colorfully put it, "I have to work out a billion things at the office to get things ready for Delaware. They have better laws regarding shit like bob is pulling and we have connections there." Ex. 1.

In November 2015, Petigrow drafted Dr. Harris's letter of resignation from the Board, which he purportedly signed on November 16, two years after his Alzheimer's diagnosis. His resignation left Mary Ellen as the sole director. Petigrow drafted a power of attorney in which Dr. Harris empowered Mary Ellen to act on his behalf. Dr. Harris purportedly signed it, and Lolli witnessed it. Petigrow also drafted two proxies that Mary Ellen could use to vote Dr. Harris's shares, one for Dr. Harris to sign and one for Mary Ellen to sign using her power of attorney.

In December 2015, Mary Ellen provided an initial set of approvals for the Inbound Merger. She also appointed herself President and began paying herself $5 million per

6

year for serving in that role. She continued the payments until 2019, when she resigned after the filing of this litigation. She appointed a lawyer to succeed her and paid him 11.5% of what she paid herself.

## F.     Value Extraction On A Larger Scale

In 2016, Mary Ellen and the Advisors stepped up their extraction of value from the Company. In February, Mary Ellen signed a written consent approving an employment agreement with Petigrow that paid him $600,000 per year to serve as Vice President and General Counsel for the Company. Petigrow continued to run a solo law practice out of the Company's offices, using the Company's personnel and resources, and without paying rent.

In March 2016, Lolli had a physician friend declare Dr. Harris incapacitated. That same month, Mary Ellen adopted a resolution in her capacity as sole director that paid Dr. Harris a bonus in the amount of $15 million. In light of Dr. Harris's incapacitation, the $15 million bonus was a disguised distribution to Mary Ellen.

Schwager cashed in too. Given the Company's minimal operations, the services for its accounting and taxes should have cost $20,000 to $30,000 per year. The Company entered into an arrangement with Schwager under which the Company paid him simultaneously on two parallel schedules: (i) $12,500 a month for a total of $150,000 per year, and (ii) $25,000 quarterly for another $100,000 per year. He also received annual "Merry Christmas" bonuses of $35,000. Schwager thus raked in $285,000 per year, ten times what the Company should have been paying.

7

On May 1, 2016, the Inbound Merger became effective, and the Company emerged as a Delaware corporation. Robert exercised dissenters' rights and pursued an appraisal proceeding in New Jersey state court. He also filed plenary litigation.

Now firmly in control of the Company, and believing that they had protection under Delaware law, Mary Ellen and the Advisors used Company funds to pay for an array of personal expenses. On the Company's taxes, Schwager deducted the expenses as if they were business related.

In April 2017, Dr. Harris died. The shares in his GRAT that would have gone to the Siblings passed to the marital trust.

### G.     The Transactions To Preserve Control

During the second half of 2018, Mary Ellen and the Advisors engaged in two transactions to preserve their control over the Company. The first was a settlement with Robert, who was continuing to pursue his lawsuits. Just before Mary Ellen's deposition, she settled with Robert by having the Company pay him more than $20 million.

The second transaction involved Mary Ellen's GRAT. It was still scheduled to expire on December 31, 2018, at which point 245 shares representing just under 25% of the Company's common stock would be distributed to the Siblings. Under the trust agreement governing the GRAT, Mary Ellen could withdraw assets if she provided the trust with "equivalent value." Compl. ¶ 95. The Advisors decided that Mary Ellen would withdraw the shares at a lowball price, thereby benefiting herself by preventing a block of shares from falling into potentially adverse hands while expropriating the difference between the lowball price and fair value (the "Share Withdrawal").

8

To support a lowball price for the Share Withdrawal, Petigrow commissioned an appraisal of the Company from EisnerAmper LLP, a valuation firm. Schwager helped furnish the firm with information.

The appraisal valued the Company at $242,863,296. The plaintiffs have pointed to substantial flaws in the appraisal, including a facially questionable 20% company-specific risk premium that increased the discount rate from 13% to 33%. The 20% company-specific risk premium was based in large part on a pending application by generic pharmaceutical companies for certiorari to the Supreme Court of the United States. As of November 19, 2018, weeks before what should have been a December valuation date, the Supreme Court had denied certiorari. *See Accord Healthcare, Inc. v. UCB, Inc.*, 139 S. Ct. 574 (2018). After more questionable discounts, the report appraised the 245 shares at $52,677,000, or 21.7% of the value of the Company. The shares represented 24.5% of the Company's capitalization, so on that basis alone, Mary Ellen was paying 88.5% of their value (21.7% divided by 24.5%) for a built in 11.5% discount. The underpricing was much greater because the Company itself was undervalued. Backing out the 20% company-specific risk premium increases the value of the Company to $325 million. A 24.5% share of that value is $79,625,000. Mary Ellen's valuation was 66.1% of that figure, meaning that Mary Ellen was getting a 33.9% discount.

With a lowball valuation in hand, the next step was to find a trustee who would go along with the Share Withdrawal. And with the expiration date of the GRAT rapidly approaching, Mary Ellen and the Advisors needed a trustee who would sign off quickly, before December 31, 2018.

9

The Advisors went back to First Republic Bank, where Selcow had benefitted from managing more of Mary Ellen's assets. Selcow readily agreed and secured the greenlight to have First Republic Delaware become the trustee for Mary Ellen's GRAT.

First Republic Delaware officially became trustee of Mary Ellen's GRAT on December 24, 2018. Within two days, First Republic Delaware had approved the Share Withdrawal at the valuation set by Mary Ellen's appraiser.

## H. Tim Harris Hires Counsel And Asks Questions.

The Siblings had heard rumblings about the Share Withdrawal. On February 14, 2019, Megan Harris Loewenberg asked if anything was happening with Mary Ellen's GRAT. She received a misleading response. Over a month later, First Republic Delaware told Tim Harris that "Mary Ellen exercised her power to substitute the Harris FRC stock with cash." *Id.* ¶ 110. That same week, First Republic Bank was in discussion with the Advisors about moving the "Mary Ellen and the Harris FRC relationship from Schwab to First Republic." *Id.* ¶ 111.

On April 10, 2019, Tim Harris's counsel in this action attended the Company's annual meeting as his proxy. Petigrow and Grinnell attended for the Company. Mary Ellen did not attend. Petigrow chaired the meeting. Grinnell refused to identify himself. Petigrow called for a vote for the election of Mary Ellen as the Company's sole director and exercised proxies from Mary Ellen and First Republic Delaware in favor of her election. After tallying the vote, he called the meeting to a close.

Before the meeting was adjourned, Tim Harris's counsel asked for a report on the business of the Company, then followed up with a series of specific questions. Petigrow

10

and Grinnell failed to provide substantive answers on numerous topics. Grinnell repeatedly asserted that all stockholder questions needed to be put in writing.

## I.     The Outbound Merger

With Tim Harris having retained a Delaware lawyer whose questions had not been answered, the Advisors anticipated that a books-and-records demand would be coming. Immediately after the annual meeting, they started working on a merger that would take the Company out of Delaware and back to New Jersey (the "Outbound Merger"). Grinnell circulated a New Jersey Supreme Court decision which indicated that inspection rights could be limited to formal documents like financial statements, minutes, and a list of stockholders. The Company did not keep minutes, and Schwager prepared the Company's financial statements so that they did not reveal the many self-interested transactions or the payments to Royce. The Advisors thought by using the Outbound Merger to take the Company back to New Jersey, they could prevent Tim Harris and the other Siblings from obtaining information about the Company. They also thought that the Outbound Merger would cut off the Siblings' standing to assert derivative claims regarding events predating the merger, as they have argued in this case.

On May 6, 2019, Tim Harris sent the Company a written demand for documents under Section 220. On May 13, the Company refused to produce any documents, claiming the demand constituted "harassment." *Id.* ¶ 127.

The Outbound Merger became effective on May 17, 2019. Mary Ellen approved the Outbound Merger as a director, and Mary Ellen and First Republic Delaware executed written consents approving it as stockholders.

11

The notice provided scant information about the Outbound Merger. The notice did not include any information about the large payments going to Royce and to Schwager, the plentitude of personal expenses being paid for by the Company, or the numerous entities being run out of the Company's offices.

## J.     This Litigation

The Outbound Merger stymied Tim Harris's attempt to use Section 220, but it opened up another informational avenue. Tim Harris sought appraisal for one share of Company common stock. In discovery, he requested the information that a books-and-records inspection would have generated. Discovery did not go smoothly, and the court has expended significant judicial resources addressing various discovery motions.

In September 2021, Tim Harris filed an amended petition and complaint that added plenary claims for breach of fiduciary duty against Mary Ellen and claims for breach of fiduciary duty and aiding and abetting against the Advisors. In October, Kristen Harris and Loewenberg joined the case as additional plaintiffs.

## K.     The Currently Operative Complaint

In March 2022, the plaintiffs filed the Complaint. It asserts claims against Mary Ellen, Petigrow, Lolli, Grinnell, Royce, and Schwager.

Count I of the Complaint asserts that Mary Ellen has breached her fiduciary duties as President, sole director, and controlling stockholder of the Company. Although Count I originally pled multiple theories, this court issued a decision holding that the only theory currently at issue in Count I is a direct challenge to the Outbound Merger. *Harris v. Harris*, 2023 WL 115541, *2 (Del. Ch. Dec. 6, 2023) (the "Standing Decision"). The

12

derivative theories originally included in Count I remain at issue, but as corporate assets to be valued in connection with the challenge to the Outbound Merger.

Skipping for the moment over Count II, Count III asserts claims for breach of fiduciary duty against the Advisors in their capacities as officers and agents. The substance of the claims for breach of fiduciary duty against the Advisors generally tracks the claims against Mary Ellen. The Standing Decision applies to this count, so the only theory currently at issue is a direct challenge to the Outbound Merger.

Count IV alleges in the alternative that to the extent the Advisors are not accountable for breaching their own duties as fiduciaries, both they and Royce have aided and abetted breaches by Mary Ellen, Petigrow, and any other Advisor that is found to have owed duties. The Standing Decision applies to this count as well, so the only theory currently at issue is a direct challenge to the Outbound Merger.

Counts II and V challenge the Share Withdrawal. Count VI is the claim for an appraisal.

Petigrow, Schwager, Lolli, Grinnell, and Royce have asked the court to rely on *forum non conveniens* to dismiss this action in deference to actions pending in New Jersey. This decision addresses that motion.

## II.    LEGAL ANALYSIS

A motion invoking the doctrine of *forum non conveniens* proceeds under Rule 12(b)(3) and seeks dismissal on grounds of improper venue. *See Lefkowitz v. HWF Hldgs., LLC*, 2009 WL 3806299, at *3 (Del. Ch. Nov. 13, 2009). When considering such a motion, the court is not "shackled to the plaintiff's complaint" and "is permitted to

13

consider extrinsic evidence from the outset . . . ." *Simon v. Navellier Series Fund*, 2000 WL 1597890, at *5 (Del. Ch. Oct. 19, 2000); *accord Troy Corp. v. Schoon*, 2007 WL 949441, at *2 (Del. Ch. Mar. 26, 2007).

When evaluating a motion based on *forum non conveniens*, a Delaware court considers the so-called "*Cryo-Maid* factors." *See Gen. Foods Corp. v. Cryo-Maid, Inc.*, 198 A.2d 681, 684 (Del. 1964). In paraphrased form, they are:

> (1) the existence of other litigation involving substantially similar parties or subject matter;
>
> (2) whether the controversy depends upon a question of Delaware law which the courts of this State more properly should decide than those of another jurisdiction;
>
> (3) the relative ease of access to proof;
>
> (4) the availability of compulsory process for witnesses;
>
> (5) any other matters that would affect the conduct of the litigation and the expeditious and economic administration of justice.[4]

The paraphrased list identifies the factors in their relative order of importance for corporate and commercial disputes.[5] "Together, these factors have come to form the core of Delaware's traditional *forum non conveniens* analysis." *Gramercy*, 173 A.3d at 1037.

---

[4] *Id.*; *accord Martinez v. E.I. DuPont de Nemours & Co., Inc.*, 86 A.3d 1102, 1104 (Del. 2014). The Delaware Supreme Court's recent discussions of *forum non conveniens* have addressed cases involving claims arising under the law of foreign countries and potential deference to courts in those countries. *See, e.g.*, *Aranda v. Philip Morris USA Inc.*, 183 A.3d 1245, 1253 (Del. 2018) (Argentina); *Gramercy Emerging Mkts. Fund v. Allied Irish Banks, P.L.C.*, 173 A.3d 1033, 1043 (Del. 2017) (Bulgaria); *Martinez*, 86 A.3d at 1107 (Argentina). The distinction between intra-country deference to another state and international deference to another country is one of degree, rather than kind. The same concepts and principles apply.

**A. The Pendency Or Non-Pendency Of A Similar Action Or Actions In Another Jurisdiction**

The first *Cryo-Maid* factor asks whether there is (i) an earlier-filed action, (ii) between the same or substantially similar parties, (iii) addressing the same or substantially similar subject matter, (iv) pending in a court capable of addressing the matter in a just way (a "Prior Action"). Whether this factor is satisfied affects the approach the court takes to the balancing of the *Cryo-Maid* factors. *See Gramercy*, 173 A.3d at 1036–38.

If a Prior Action exists and remains pending, then a Delaware court approaches the *Cryo-Maid* factors with the analysis tilted in favor of the defendant. Under an approach known as the "*McWane* doctrine," the court will dismiss or stay the Delaware action in deference to the Prior Action unless the *Cryo-Maid* factors weigh heavily in favor of allowing the Delaware action to proceed. *Id.* at 1037; *see McWane Cast Iron Pipe Corp. v. McDowell-Wellman Eng'g Co.*, 263 A.2d 281 (Del. 1970). Generally speaking, the calculus only will favor denying the motion and permitting the Delaware action to move forward if the Delaware plaintiff has invoked a specialized statutory proceeding designed

---

[5] The list omits a sixth *Cryo-Maid* factor—"the possibility of the view of the premises"—because that factor is frequently irrelevant in corporate and commercial disputes. *See, e.g.*, *Hall v. Maritek Corp.*, 170 A.3d 149, 162 (Del. Super. Ct. 2017) ("[The] third *Cryo–Maid* factor holds little to no weight even in a case where there was a relevant premises that the fact-finder might want to view.") (internal quotations omitted), *aff'd*, 182 A.3d 113 (Del. 2018); *Hamilton P'rs, L.P. v. Englard*, 11 A.3d 1180, 1212 (Del. Ch. 2010) (collecting authorities). A view of the premises is not relevant to this case, and this decision therefore does not discuss it.

to address a particular issue or if Delaware otherwise has a particularly strong interest in the dispute. *See Focus Fin. P'rs, LLC v. Holsopple*, 250 A.3d 939, 953–54, 956 (Del. Ch. 2020).

If a Prior Action once existed but no longer is pending, then the Delaware court conducts a straightforward assessment of the *Cryo-Maid* factors to determine where it makes the most sense for the action to proceed. The resulting analysis "is not tilted in favor of the plaintiff or the defendant." *Gramercy*, 173 A.3d at 1044.

If the Delaware case is the first-filed action, then the court will approach the *Cryo-Maid* factors with the analysis tilted in favor of the plaintiff. The court generally will allow the Delaware action to proceed unless the defendant shows that it would face overwhelming hardship or inconvenience from litigating in Delaware. *Id.* Although the test sounds extreme, trial judges should not perceive that the standard "suggests an insurmountable burden for defendants." *Martinez*, 86 A.3d at 1105. The test "is not intended to be preclusive." *Id.*; *accord Ison v. E.I. DuPont de Nemours & Co., Inc.*, 729 A.2d 832, 842 (Del. 1999). "[I]t is intended as a stringent standard that holds defendants who seek to deprive a plaintiff of her chosen forum to an appropriately high burden." *Martinez*, 86 A.3d at 1105. What is required is that the *Cryo-Maid* factors weigh "heavily and decisively" in favor of dismissal. *IM2 Merch. & Mfg., Inc. v. Tirex Corp.*, 2000 WL 1664168, at *1 (Del. Ch. Nov. 2, 2000); *see Martinez*, 86 A.3d at 1105 (discussing *IM2* with approval and agreeing that "a more restrained meaning is at the essence of the overwhelming hardship standard" (cleaned up)).

16

When considering whether the *Cryo-Maid* factors weigh heavily and decisively in favor of dismissal, the court should not treat them as a checklist or tally sheet. "Application of these factors is not mechanical or mathematical . . . ." *Pipal Tech Ventures Priv. Ltd. v. MoEngage, Inc.*, 2015 WL 9257869, at *5 (Del. Ch. Dec. 17, 2015). The court must "look to the circumstances as a whole to determine whether an overwhelming hardship is present." *Barrera v. Monsanto Co.*, 2016 WL 4938876, at *5 (Del. Super. Ct. Sept. 13, 2016). "The moving defendant need not show that it is factually or financially impossible to mount a defense in this jurisdiction." *Pipal Tech*, 2015 WL 9257869, at *5. When "properly applied," the doctrine "involves a wholesome balancing between the strong interest of a plaintiff in choosing the appropriate forum in which to bring her action, and the interest of the other litigants and the court in an efficient and just resolution of the issues, together with principals of comity." *Wilm. Sav. Fund Soc'y, FSB v. Caesars Ent. Corp.*, 2015 WL 1306754, at *7 (Del. Ch. Mar. 18, 2015).

In this case, there is no Prior Action. This action is first-filed by a long shot. On May 6, 2019, Tim Harris initiated the litigation process in Delaware by serving a Section 220 demand. *See Lebanon Cnty. Empls.' Ret. Fund v. Collis*, 2022 WL 17687848, at *30 (Del. Ch. Dec. 15, 2022) (using date when plaintiff served demand that was diligently pursued to determine when litigation was commenced); *Wang v. Fulton*, C.A. 3409-VCL, at 47–48 (Del. Ch. Feb. 14, 2014) (TRANSCRIPT) ("[I]t is realistic, and in the tradition of equity looking at the substance of things rather than simply at their form, to view the Section 220 as an aspect of the overall proceeding."). The defendants defeated the books-and-records demand by effectuating the Outbound Merger, but that transaction gave rise

17

to another avenue for discovery, and on September 12, Tim Harris filed an appraisal proceeding in which he conducted discovery designed to gather the information sought in the Section 220 demand. *See Wei v. Zoox, Inc.*, 268 A.3d 1207, 1223 (Del. Ch. 2022). In his petition, Tim Harris expressly reserved the right to assert other claims. *See Harris v. Harris FRC Corp.*, 2021 WL 57021, at *1, *3 (Del. Ch. Jan. 7, 2021) (noting that Tim Harris had "reserved his right to assert other claims when demanding appraisal" and "moved to modify the confidentiality order entered in this action so that he can assert plenary claims, including claims for breach of fiduciary duty"). After numerous discovery delays, Tim Harris filed the an amended petition and complaint, which Kristen Harris and Megan Harris Loewenberg later joined.

The defendants cite two actions currently pending in New Jersey plus a third that has been dismissed. The courts of New Jersey are plainly capable of handling this dispute and providing the parties with justice. But the New Jersey actions were not filed earlier than this one, and they do not involve substantially the same parties or substantially the same issues.

After this lawsuit was well underway, Tim Harris filed an action in New Jersey state court that challenged the amendments to Dr. Harris's estate plan that were implemented on October 6, 2015 (the "New Jersey Estate Planning Action"). The Company, Grinnell, and Royce are not parties to the New Jersey Estate Planning Action, so that action does not involve substantially the same parties as this one. The New Jersey Estate Planning Action also does not involve substantially the same issues as this action. It does not involve any claims relating to the Outbound Merger or the Share Withdrawal,

18

nor does it address any of the events underlying the derivative claims that this court will consider as assets of the Company in connection with the challenges to the Outbound Merger. Conversely, this action does not challenge the modifications to Dr. Harris's will and GRAT that took place in October 2015. The Complaint and this decision reference those events as background, but the plaintiffs do not assert any claims or seek any relief about what took place.

Two other actions in New Jersey derived from discovery in this proceeding. After Mary Ellen, Lolli, and Grinnell worked together to frustrate the plaintiffs' efforts to obtain meaningful information about Royce from the Company, Tim Harris's counsel issued subpoenas to Grinnell, Royce, and Bank of America N.A., where Royce had bank accounts. Grinnell and Royce responded by filing a miscellaneous proceeding in New Jersey state court to quash the subpoenas (the "New Jersey Miscellaneous Action"). During a series of conferences with the New Jersey judge, Grinnell and Royce first refused to produce anything, then agreed to produce W-2s and K-1s, then refused to produce K-1s, and then reverted to refusing to produce anything. Their counsel could not explain their about face. She has since withdrawn. The New Jersey Miscellaneous Action has been dismissed. It was solely an action about enforcing a subpoena. It was ancillary to this action. It was not a plenary action that involved substantially the same parties and issues as this case.

In an effort to break through the problems that were plaguing the discovery process, the court appointed a discovery facilitator. He recommended that Royce and Bank of America produce documents in response to the subpoenas. Lolli, Grinnell, and

Royce lashed out by filing another action in the New Jersey state court, this time alleging purported constitutional violations and seeking to enjoin Bank of America from complying with this court's subpoena (the "New Jersey Discovery Action"). The New Jersey court subsequently denied the application, but Lolli, Grinnell, and Royce have repackaged their theories as claims for malicious prosecution. The Company, Mary Ellen, Lolli, Petigrow, Schwager, Kristen Harris, and Megan Harris Loewenberg are not parties to the New Jersey Discovery Action, and that lawsuit does not involve any claims relating to the Outbound Merger or the Share Withdrawal, nor does it address any of the events underlying the derivative claims that this court will consider as assets of the Company in connection with the challenges to the Outbound Merger. Conversely, this action does not involve any of the strident assertions about the ordinary progression of discovery that Lolli, Grinnell, and Royce have made the focus of the New Jersey Discovery Action.

None of the New Jersey actions could be regarded as a Prior Action for purposes of *McWane*. The defendants therefore bear the burden of proving that they would experience overwhelming hardship or inconvenience from litigating in Delaware. *Gramercy*, 173 A.3d at 1044.

**B.      The Extent To Which The Controversy Depends On Issues Of Delaware Law**

The second *Cryo-Maid* factor examines "whether or not the controversy is dependent upon the application of Delaware law which the courts of this State more properly should decide than those of another jurisdiction." *Cryo-Maid*, 198 A.2d at 684.

> Choice of law under *Cryo-Maid* operates as a proxy for Delaware's interests, and the analysis must address the degree to which Delaware has a particular interest in the subject matter of the case. It therefore includes considerations such as the nature and novelty of questions of law to be answered, the desirability of providing a Delaware forum, and the importance of overseeing the conduct of particular classes of actors and policing against particular types of wrongdoing.

*Hamilton*, 11 A.3d at 1213; *see Warburg, Pincus Ventures, L.P. v. Schrapper*, 774 A.2d 264, 271 (Del. 2001) (explaining that the "choice of law factor, while relevant to establishing hardship and inconvenience, primarily focuses on 'Delaware's interest in the litigation'" (quoting *Ison*, 729 A.2d at 843 (Del. 1999))).

As a result of the Standing Decision, the two principal claims in this case are governed by Delaware law. The first claim is a direct challenge to the Outbound Merger on the grounds that (i) Mary Ellen and Petigrow failed to disclose all material information in connection with that transaction, (ii) Mary Ellen and Petigrow failed to afford any value to the Company's pending derivative claims, and (iii) the other Advisors aided and abetted Mary Ellen and Petigrow in their breaches of duty. That claim is governed by Delaware law. *See, e.g.*, *Morris v. Spectra Energy P'rs (DE) GP, LP*, 246 A.3d 121, 138–39 (Del. 2021); *Parnes v. Bally Ent. Corp.*, 722 A.2d 1243, 1244–46 (Del. 1999); *In re Primedia, Inc. S'holder Litig.*, 67 A.3d 455, 477–90 (Del. Ch. 2013).

There are derivative claims that will need to be considered to determine whether the Outbound Merger was an interested transaction, when assessing whether its terms were entirely fair, and to value the Company for purposes of a quasi-appraisal remedy. Under the internal affairs doctrine, the law that governs the underlying claims for breach of fiduciary duty and aiding and abetting depends on whether the Company was a

21

Delaware corporation or a New Jersey corporation when the misconduct occurred. Mary Ellen gained control of the Company in April 2015. The Company became a Delaware corporation in May 2016 as a result of the Inbound Merger, and it remained a Delaware corporation until May 2019, when the Outbound Merger closed. All of the derivative claims challenging alleged incidents of self-dealing and wrongful extraction of value that took place during the Company's three-year stint in Delaware are governed by Delaware law. Standing Decision, 2023 WL 115541, at *11.

To be sure, there are some transactions that pre-date the Company's sojourn in the First State, and those claims will be governed by New Jersey law, but that does not undermine the primacy of Delaware law. The central claim—the challenge to the Outbound Merger—is governed by Delaware law. As part of deciding that claim, the court will be considering the underlying derivative claims, but the court will not be deciding the underlying derivative claims as claims in their own right. The parties will need to conduct discovery into the underlying claims and present sufficient evidence regarding the claims so that the court can assess the fairness of the Outbound Merger and value the Company, but the court will not need to make formal determinations regarding liability. To the extent New Jersey law governs aspects of the underlying claims, the role of New Jersey law is secondary.

The plaintiffs' challenges to the Share Withdrawal are also governed by Delaware law. Section 3332(b) of Title 12 of the Delaware Code provides that that "[e]xcept as otherwise provided by the terms of a court order and notwithstanding a general choice of law provision in the governing instrument of a trust, . . . the laws of this State shall

22

govern the administration of a trust while the trust is administered in this State . . . ." 12 *Del. C.* § 3332(b). The statute creates a default rule under which the appointing of a Delaware trustee brings the trust situs into Delaware and results in the application of Delaware law to trust administration. *In re Peierls Fam. Inter Vivos Trs.*, 77 A.3d 249, 256 (Del. 2013). The appointment of First Republic Delaware as the trustee of Mary Ellen's GRAT caused the situs of the GRAT to move to Delaware and caused Delaware law to govern its administration. As part of that transaction, the trust instrument governing Mary Ellen's GRAT was amended to confirm that "the situs of the Trust shall be Delaware" and "the governing law of the Trust shall henceforth be the law of the State of Delaware." Ex. 16 at '945. Mary Ellen and the GRAT subsequently engaged in the Share Withdrawal, which therefore must be tested under Delaware law.

A final and critical factor is Delaware's "strong interest in policing against duty of loyalty violations and the misuse of its entities for fraudulent purposes." *Hamilton*, 11 A.3d at 1218. "Delaware has more than an interest in providing a sure forum for shareholder derivative litigation involving the internal affairs of its domestic corporations. Delaware has an obligation to provide such a forum." *Sternberg v. O'Neil*, 550 A.2d 1105, 1125 (Del. 1988) (internal citations and footnote omitted). "Delaware courts have a significant and substantial interest in overseeing the conduct of corporate fiduciaries." *Hamilton*, 11 A.3d at 1213; *see, e.g.*, *Ryan v. Gifford*, 918 A.2d 341, 349–50 (Del. Ch. 2007); *In re Chambers Dev. Co., Inc. S'holders Litig.*, 1993 WL 179335, at *3 (Del.Ch. May 20, 1993). Likewise, "Delaware has a powerful interest of its own in preventing the entities that it charters from being used as vehicles for fraud. Delaware's

legitimacy as a chartering jurisdiction depends on it." *NACCO Indus., Inc. v. Applica, Inc.*, 997 A.2d 1, 26 (Del. Ch. 2009). As the Supreme Court of the United States has recognized, a chartering state has "a substantial interest in preventing the corporate form from becoming a shield for unfair business dealing." *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 93 (1987).

In this case, the defendants came to Delaware in the apparent belief that Delaware law would provide an accommodating forum for their schemes. *See* Ex. 1 (Mary Ellen stating "I have to work out a billion things at the office to get things ready for Delaware. They have better laws regarding shit like bob is pulling and we have connections there."). Then, when Tim Harris began asking questions, the defendants attempted to flee the state. Delaware has an interest in having the defendants' conduct reviewed under its laws to evaluate whether it passes muster.

Given the predominant role of Delaware law and Delaware's significant interest in this dispute, the second *Cryo–Maid* factor militates powerfully in favor of retaining jurisdiction.

## C.    The Relative Ease Of Access To Proof

The third *Cryo-Maid* factor examines the relative ease of access to proof. *Holsopple*, 250 A.3d at 973–74. With current technology, the importance of this factor has faded for corporate and commercial disputes.[6] In the third decade of the twenty-first

---

[6] *See, e.g., Barrera*, 2016 WL 4938876, at *6 (observing that evidence may be transmitted electronically with ease); *Pipal Tech*, 2015 WL 9257869, at *6 (noting that "[m]odern methods of information transfer render concerns about transmission of

century, "evidence has undergone a shift to electronic data and courts now recognize that transmittal of evidence electronically is not a burden, particularly in corporate and commercial disputes." *GXP Cap., LLC v. Argonaut Mfg. Servs., Inc.*, 253 A.3d 93, 103 (Del. 2021) (internal quotation marks omitted).

For this factor to weigh in favor of dismissal, the defendants must "identify specific evidence that could not be produced in Delaware." *Id.* "[M]ost corporate litigation in the Court of Chancery involves companies and documents located outside of Delaware, and this mere inconvenience, without more, does not warrant a stay or dismissal." *Rosen v. Wind River Sys., Inc.*, 2009 WL 1856460, at *6 (Del. Ch. June 26, 2009) (cleaned up).

The defendants have not pointed to any evidence that could not be produced in Delaware. This factor favors denying the motion.

## D. The Availability Of Compulsory Process For Witnesses

The fourth "*Cryo-Maid* factor asks whether this court can compel the relevant witnesses to appear for discovery and trial." *Holsopple*, 250 A.3d at 974. When assessing

---

documents virtually irrelevant") (internal quotations omitted); *Vichi v. Koninklijke Philips Elecs. N.V.*, 2009 WL 4345724, at *13 (Del. Ch. Dec. 1, 2009) (noting that parties to Delaware action could collect evidence from other jurisdictions, even where most of the relevant documents and witnesses were in Italy and the Netherlands); *In re IBP, Inc. S'holders Litig.*, 2001 WL 406292, at *9 (Del. Ch. Apr. 18, 2001) ("While it is true that Arkansas will be more convenient for Tyson's witnesses, that is not a substantial factor. Depositions can be scheduled in a manner convenient to witnesses, and business travel is expected of top corporate executives . . . .").

this factor, the court "must evaluate whether 'another forum would provide a substantial improvement as to the number of witnesses who would be subject to compulsory process.'" *Aveta, Inc. v. Colon*, 942 A.2d 603, 613 (Del. Ch. 2008). The court's subpoena power is not limited to individuals who reside in or pass through Delaware. Through its jurisdiction over Delaware entities, "this Court can compel production of (i) documents in the entities' possession, custody, or control, (ii) corporate representatives pursuant to Rule 30(b)(6), and (iii) officers, directors, and managing agents of the firms pursuant to Rule 30(a)." *Hamilton*, 11 A.3d at 1214.

The principal witnesses to the events in question are parties to the case. The defendants correctly point out that all of the defendants live in New Jersey, but they remain subject to compulsory process in this court. With one exception, the court has ruled that each of the defendants is subject to this court's jurisdiction and can be compelled to participate in discovery and appear at trial. If necessary, sanctions can be imposed and entered as orders, or a default judgment can be awarded. Those orders can be domesticated and enforced in New Jersey. The lone exception is Schwager, where the court has deferred ruling on whether this court can exercise jurisdiction over him until after jurisdictional discovery.

The principal non-party witness, First Republic Delaware, is a Delaware entity and subject to this court's jurisdiction. Any other third parties organized as Delaware entities also would be subject to this court's jurisdiction.

It is possible that there could be non-party witnesses that live in New Jersey and who are outside this court's jurisdiction. As to those witnesses, a New Jersey court would

26

have an advantage. The advantage is not overly great because the parties can secure subpoenas through the commission process or by using the Uniform Interstate Depositions and Discovery Act, which both Delaware and New Jersey have adopted. *See* 43 *Del. C.* § 4311; N.J. R. 4:11-4 to 11-5. The depositions of those witnesses who are not subject to this court's jurisdiction can be used at trial.

The parties have not pointed to legitimate witnesses who are beyond the court's subpoena power. The defendants state that they intend to depose the two non-party Siblings, their spouses and children, and the physicians for Dr. Harris and Mary Ellen. Those are credibility-compromising threats. It is highly unlikely that those individuals would have any knowledge relevant to the claims at issue. But the idea of deposing those witnesses is consistent with how some of the defendants, most notably Mary Ellen, Lolli, and Grinnell, have approached discovery. They have repeatedly sought to frustrate discovery in this proceeding, then leveled over-the-top allegations in the New Jersey Miscellaneous Action and the New Jersey Discovery Action about the burdens and injustice associated with producing materials that are plainly relevant. Then, when the time came to identify witnesses who might be necessary for trial and beyond the court's subpoena power, they identified individuals tangential to this proceeding who appear to have been selected to cause maximum annoyance. The court already quashed a subpoena that the defendants served, in-person during the pandemic, on Tim Harris's spouse because "[t]he circumstances surrounding the subpoena suggest that it was served for purposes of harassment . . . ." *Harris v. Harris FRC Corp.*, 2021 WL 1103395, at *2

27

(Del. Ch. Mar. 22, 2021). The defendants' argument about witnesses smacks of more of the same.

The fifth factor is in equipoise. To be charitable to the defendants, it marginally favors dismissal.

**E.     All Other Practical Problems That Would Make The Trial Easy, Expeditious, And Inexpensive**

The last *Cryo-Maid* factor is a catch-all factor that "looks to any other matters that would affect the conduct of the litigation and the expeditious and economic administration of justice." *Holsopple*, 250 A.3d at 974. "Under this prong, Delaware courts have examined a wide array of considerations[,] including judicial economy, the motives of the parties filing suit in the respective jurisdictions, and public interest." *Pipal Tech*, 2015 WL 9257869, at *9. "It authorizes a trial court to take into account the need to control its own docket, manage its affairs, achieve the orderly disposition of its business, and promote the efficient use of judicial resources." *Holsopple*, 250 A.3d at 974–75. The final factor "will seldom, in isolation, be dispositive of whether dismissal on the grounds of *forum non conveniens* is warranted." *Martinez*, 86 A.3d at 1113.

A significant consideration under this factor is the amount of judicial resources that the court already has devoted to the case. The parties have litigated in this court for three years, and the court has expended a significant amount of time addressing and resolving discovery disputes. After engaging in a pattern of bad faith discovery conduct, the defendants would understandably like to start over with a clean slate elsewhere. That is not a reason for dismissal. It is a reason for retaining the case. A new judge would have

28

to invest time and energy to come up to speed on the issues, and given the defendants' litigiousness, the new judge likely would be asked to revisit the decisions that this court has made. Dismissing the action thus would result in considerable duplication of effort, and the timeline for resolving it would be extended further into the future.

As their principal argument under this factor, the individual defendants point out that all of them live in New Jersey. True, but the Garden State is not a faraway country. It is not even a faraway state. Delaware and New Jersey are neighbors. Interstate 95 transects both, and Interstate 295 links the two. Amtrak offers convenient rail service, and a more cost-conscious traveler can take New Jersey Transit to Trenton, then change to SEPTA for a commuter train to Wilmington. And while the Delaware River serves as a dividing line, the Delaware Memorial Bridge, the Commodore Barry Bridge, the Benjamin Franklin Bridge, and the Betsy Ross Bridge (to name a few) connect the opposing banks.

For the defendants to litigate in Delaware is not a significant burden. They happily moved the Company to Delaware for three years, and they established an office for the Company in Newark. They happily moved Mary Ellen's GRAT to Delaware to facilitate the Share Withdrawal. They can handle litigating in this court.

## F.     The Overall Balancing

In the absence of a Prior Action, the defendants must establish that they will suffer overwhelming hardship from litigating in this court, which means that the *Cryo-Maid* factors, taken as a whole, must favor dismissal heavily and decisively. The defendants have failed to make that showing. The choice of law factor and the practical

29

considerations associated with the case point strongly in favor of this court retaining jurisdiction. The ease of access to proof is in equipoise. The availability of compulsory process for witnesses points marginally in favor of New Jersey. Taking all the factors into account, they do not aggregate to the level of hardship required for dismissal.

## III.  CONCLUSION

The court will not dismiss this action under the doctrine of *forum non conveniens.* The motion for dismissal on that basis is denied.